(C. D. 1239)

GILBERTON CO. *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided May 4, 1950)

*Siegel, Mandell & Davidson* (*Joshua M. Davidson* of counsel) for the plaintiff. *David N. Edelstein*, Assistant Attorney General (*Chauncey E. Wilowski* and *Arthur R. Martoccia*, special attorneys), for the defendant.

Before LAWRENCE and RAO, Judges; FORD, J., not participating

RAO, Judge: This case involves the question of the proper classification of certain comic magazines which had been assessed with duty at the rate of 20 per centum ad valorem pursuant to the provisions of paragraph 1410 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, as pamphlets other than those of *bona fide* foreign authorship not specially provided for. Three claims are set forth in the protests and in amendments thereto as the bases for the plaintiff's assertion that the said classification is erroneous. Of these, the claim originally made in each of the protests, that the merchandise in issue was free of duty under the provisions of paragraph 1726 of said act, as periodicals, was specifically abandoned by counsel for the plaintiff at the time of trial.

Principal reliance is here based upon the contention that these comic magazines are dutiable at the rate of 15 per centum ad valorem as books for children's use, as provided for in said paragraph 1410. Alternatively, it is claimed that certain of the magazines are dutiable at only 7½ per centum ad valorem under the provisions of said paragraph 1410 as books of *bona fide* foreign authorship.

Paragraph 1410 of the Tariff Act of 1930 provides in part as follows:

Par. 1410.  Unbound books of all kinds, bound books of all kinds except those bound wholly or in part in leather, sheets or printed pages of books bound wholly or in part in leather, pamphlets, music in books or sheets, and printed matter, all the foregoing not specially provided for, if of bona fide foreign authorship, 15 per centum ad valorem; all other, not specially provided for, 25 per centum ad valorem: * * * books of paper or other material for children's use, printed lithographically or otherwise, not exceeding in weight twenty-four ounces each, with reading matter other than letters, numerals, or descriptive words, 15 per centum ad valorem; * * *

The rate of duty on books of *bona fide* foreign authorship and all others has been reduced by the trade agreement with the United Kingdom to 7½ per centum and 20 per centum, respectively.

When this case was called for trial, plaintiff introduced into evidence samples of the merchandise covered by each of the invoices before the court. These consist of magazines stipulated to be printed books of paper, weighing, individually, not more than 24 ounces, with reading

matter other than letters, numerals, or descriptive words. Each of the samples is one of a series of comic books produced by plaintiff under the caption "Classic Comics." Plaintiff's exhibit 1 contains an adaptation by one Dan Levin of Washington Irving's "Rip Van Winkle and the Headless Horseman," illustrated by one Rolland H. Livingstone. In addition, it includes a story entitled "First R. C. A. F. Pilot to Win the Victoria Cross in Second World War," a biography of Washington Irving, authorship of which items is not revealed; a story bearing the title "And One Came Back" by one Evelyn Goodman; and the complete version of Alfred Lord Tennyson's "The Charge of the Light Brigade."

Plaintiff's exhibit 2, Classic Comics No. 13, is the story of "Dr. Jekyll and Mr. Hyde" by Robert Louis Stevenson, adapted by the said Evelyn Goodman, illustrated by Arnold L. Hicks. It contains, in addition, a two-page story entitled "Secret Under the Sea" by Dan Kushner and a short biography of Robert Louis Stevenson.

Plaintiff's exhibit 3 consists of an adaptation of Daniel Defoe's "Robinson Crusoe," illustrated by Stanley Maxwell, adapter not indicated. It contains a biography of the author of the original tale as well as an article on the Canadian Bushfliers, a story of a hero of the Dieppe Raid, a tale of a Portuguese Desert Explorer by one Michael Sullivan, and Poems of the Sea, by Matthew Arnold, Alfred Lord Tennyson, and Charles Kingsley.

According to Mr. Albert L. Kanter, the only witness in the case, who testified on behalf of the plaintiff, exhibit 2 "* * * is an authentic and almost complete adaptation of the original classic." His testimony with respect to plaintiff's exhibit 2, which he stated applies with equal force to the other exhibits, is as follows:

By Mr. Davidson:

Q. Mr. Kanter, what do you mean by "almost complete"?—A. To say that it contains the complete original text would be impossible, because this is limited to about 36 pages of illustrations. The original book had about 400 or 450 tightly printed pages. However, in this instance, as in the instance of all of our publications, we give the complete story in the author's own phraseology and use his exact words wherever and whenever possible.

Judge Lawrence: Do you mean to imply that it is a complete story of the original work of Mr. Stevenson, but in an abridged form?

The Witness: Yes, Your Honor, complete story done in illustrations, and we have some years ago found that one picture will describe many, many chapters of written prose or description.

Judge Lawrence: You say here there are how many pages?

The Witness: There are approximately 36 pages of illustrations.

Judge Lawrence: How many pages of narrative?

The Witness: They all contain narrative. Each scene is described. We describe, in other words, what we call a description of the story itself, and then of course there are little balloons that go along as expressions of the characters depicted in the book. They are all authentic, and we always use the author's own story.

By Mr. Davidson:

Q. And together with the author's story, you use certain illustrations to bear out the words?—A. We illustrate the story, the action, the scenes, the characters.

Q. And those are the words of Robert Louis Stevenson?—A. That is right.

It further appears that this witness, as president and promotion director of plaintiff, a firm which publishes children's books and magazines, has traveled extensively throughout the United States to stimulate the sales of his company's books and magazines. In connection with his promotional activities, he has seen books such as the exhibits before the court used in schoolrooms to acquaint youngsters with their stories. They are also used by Boy Scout groups, Cub Scout groups, boys' club groups, classic readers' groups, and even in the Army. In instances where children have not yet learned to read, the contents of the books are read to them. Older children read them by themselves. According to this witness, the books are read by practically all children from the age of 5 and up, but they are primarily for children's reading, that is, anyone in the age group between 5 and 10 years, the language of the original author being scaled down to make it comprehensible to a very young group.

The issue which we must now determine is whether the so-called classic comics here involved are books "for children's use" within the meaning of paragraph 1410, *supra*, as that phrase has been judicially construed. In *United States* v. *Frederick Warne & Co.*, 18 C. C. P. A. (Customs) 380, T. D. 44638, it was held that those words were "intended to include only children of a tender age," that is to say, those of kindergarten age and those children slightly older "who have learned to read stories simply told and easily comprehended." With that construction of the statutory language in mind, the court proceeded to analyze each of the 16 books which had been offered in evidence as representative samples. Where it was found that the stories were told in language simple enough to be readily understood by children who had not yet learned to read, the book in question was held to fall within the provision of paragraph 1310 of the Tariff Act of 1922 (the prototype of paragraph 1410 of the present tariff act) as books for children's use. Certain other exhibits, which contained language not comprehensible to a young child, were held to be excluded from the provision for books for children's use.

From the decision in the *Warne* case, *supra*, this court in *Oxford University Press (Inc.)* v. *United States*, 60 Treas. Dec. 1080, T. D. 45335, derived certain rules or tests, in addition to the age test above referred to, to be used in reaching a determination of whether or not books are classifiable as books for children's use. These were stated to be as follows:

(1) Whether or not they contained *pictures of children*.

(2) Whether or not they were *profusely* illustrated, that is, consisted principally of illustrations.

(3)  Whether or not the language was *simple,* such as a very young child could understand.

(4)  Whether or not they contained *music.*

(5)  Whether or not they contained *specific words* which a young child could not be expected to understand.  [Italics quoted.]

In several respects the books now before this court fail to meet the requirements specified, *supra,* for books for children's use.  Though each of the exhibits is profusely illustrated, the illustrations being an essential and integral part of the story told, they are not of a general character that would normally appeal to children of a very tender age.  They are so contrived that their significance depends in large part upon the accompanying descriptive and conversational language.  Standing alone, they fail to convey any real impression of the story told.  A very young child could not be expected to understand or derive any story content from illustrations which have the effect of describing, as stated by plaintiff's witness, "many, many chapters of written prose or description."  Furthermore, the illustrations in plaintiff's exhibit 2 are of so weird and awe-inspiring a nature as would be calculated to frighten and disturb, rather than entertain and amuse, children in the age group with which we are here concerned.  The few pictures of frantic children which are included in that exhibit scarcely fall within the category of pictures of and for children, which this court referred to in the *Oxford University Press* case, *supra.*

Despite testimony that the language of the original author was scaled down to the intellectual level of the very young child, we find, from a perusal of the exhibits, that they are not couched in language simple enough for the comprehension of a child of about kindergarten age.  Both in general phraseology and in specific words employed, the books in question require a more mature mind than that of a 5- or 6-year-old for any intelligent comprehension of their contents.  Some of the specific words found in the various exhibits which a young child would not be expected to understand, are the following: "undaunted," "sages," "philosophers," "resounds," "descent," "weird," "gully," "amphitheater," and "resign" in exhibit 1; "gruesome," "scientific," "compounding," "vaporous," "potion," "counterpart," "financially," "urgently," and "repels" in exhibit 2; and "reassuring," "infested," "impact," "parried," "impending," "debris," "tarpaulin," "sluice," "oath," and "careen" in exhibit 3.

In cases of this kind, an exhibit is often a very potent witness. *United States* v. *Bernard, Judae & Co.,* 18 C. C. P. A. (Customs) 68, T. D. 44029; *United States* v. *The Halle Bros. Co.,* 20 C. C. P. A. (Customs) 219, T. D. 45995; *United States* v. *May Department Stores Co.,* 16 Ct. Cust. Appls. 353, T. D. 43090.  The exhibits before this court convince us that the importations in question do not consist

of books for children's use as that phrase has been judicially defined. We hold, therefore, that the claim in the protest that the merchandise is dutiable at the rate of 15 per centum ad valorem under paragraph 1410, *supra*, as books for children's use is without merit.

Concerning the alternative contention that the books are of *bona fide* foreign authorship and therefore dutiable at the rate of 7½ per centum ad valorem, pursuant to said paragraph 1410, as modified by the trade agreement with the United Kingdom, *supra*, the record fails to establish that the authors of the imported books are foreign. We cannot agree that the authors of exhibits 2 and 3 are Robert Louis Stevenson and Daniel Defoe, respectively. While each of these non-Americans composed the original story, the adaptation of each involves independent intellectual labor and literary skill, which, in effect, creates a new version of the ideas advanced by the original author, and hence a completely new literary production. The authorship of that production lies in the adapter and illustrator, rather than in the creator of the original story.

In the case of *Oxford University Press, Inc.* v. *United States*, 66 Treas. Dec. 1095, Abstract 29385, we were confronted with a parallel situation. There, the importation consisted of books entitled "The Letters of Robert Burns." The letters, of course, as the product of the mind and pen of the Scotch poet, were the works of a foreign author. In addition, however, the books contained a preface, introduction, footnotes, glossary, appendix, and bibliography, all of which were written by one J. DeLancey Ferguson, a citizen of the United States. We held that since the books contained essentially and primarily letters written by a foreign author, the other matters included therein being incidental merely and designed to facilitate the reading of the letters, that the books in question were of *bona fide* foreign authorship.

Our conclusion in this respect was, however, specifically repudiated by our appellate court in the recent case of *Oxford University Press, N. Y., Inc.* v. *United States*, 33 C. C. P. A. (Customs) 11, C. A. D. 309, which involved a determination of the authorship of "The Oxford Book of English Verse," an anthology. It there appeared that the anthology was composed of the poems of some 300 foreign authors and 10 American poets. The completed volume was produced and prepared for publication by Sir Arthur Quiller-Couch, a subject of Great Britain. In so doing, he made an extensive survey of poetry, selected the particular poems appearing in the anthology, and wrote the prefaces, indexes, glossaries, and other explanatory portions of the work. This great intellectual effort expended by the anthologist was determined to be authorship. Hence, it was held that since Sir Arthur Quiller-Couch was an Englishman, his anthology was of *bona fide* foreign authorship. The court found the holding in Abstract 29385, *supra*, to be inconsistent with this conclusion and directed that it be disregarded.

If the acts of selection, editing, footnoting, and the writing of explanatory notes to original works constitute authorship of a book primarily composed of such original work, *a fortiori*, adaptation, abridging, selection of phraseology, and story illustration of the writings of another constitute authorship of a comic-book version of an original classic. It follows that the adapters and illustrators of the books here involved are the authors thereof. As to these, the record is devoid of proof of their citizenship. There is no evidence to overcome the finding inherent in the collector's classification that the involved books are not of *bona fide* foreign authorship. Therefore, the claim that they are of *bona fide* foreign authorship cannot be sustained.

In view of the foregoing, all claims of the plaintiff are overruled. Judgment will be entered accordingly.